# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

* * *

BRIAN BALLENTINE, *et al.*,

Plaintiffs,

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, *et al.*,

Defendants.

Case No. 2:14-cv-01584-APG-GWF

**ORDER GRANTING IN PART AND
DENYING IN PART THE
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

(ECF Nos. 174/183)

Plaintiffs Brian Ballentine, Catalino Dazo, and Kelly Patterson used sidewalk chalk to write messages critical of the Las Vegas Metropolitan Police Department ("Metro") on sidewalks in front of Metro's headquarters and the Regional Justice Center ("RJC"). Plaintiff Gail Sacco wanted to join in one of these protests but did not do so because she was afraid of being arrested. Defendants Mike Wallace and John Liberty are Metro officers who issued citations to Ballentine, Dazo, and Patterson for chalking the sidewalk in front of Metro headquarters. Defendant Christopher Tucker is a Metro officer who subsequently investigated and then filled out a declaration of arrest for Dazo, Ballentine, and Patterson for their chalking activity in front of Metro headquarters and the RJC. According to the defendants, the plaintiffs were properly cited and arrested because writing on sidewalks with chalk violates Nevada's graffiti statute, Nevada Revised Statutes § 260.330. The plaintiffs assert that the real reason the defendants cited and arrested them is because they criticized Metro, and their arrests therefore infringe on their free speech and equal protection rights under the United States and Nevada Constitutions.

The second amended complaint asserts claims under 42 U.S.C. § 1983 for violating the plaintiffs' First Amendment right to free speech and expression (count one), chilling First Amendment free speech and expression (count two), violating the First Amendment right to assembly (count three), and violating equal protection based on selective prosecution (count four). The plaintiffs also assert a free speech claim under the Nevada Constitution (count five),

along with state law claims for negligent supervision and training (count six), intentional infliction of emotional distress (count seven), and negligent infliction of emotional distress (count eight). The defendants move for summary judgment on all claims.

## I. BACKGROUND

Ballentine, Dazo, and Patterson are members of the "Sunset Activist Collective," a local activist group. ECF Nos. 176-2 at 10; 176-3 at 11. Plaintiffs have carried out chalking protests on Las Vegas sidewalks since 2011, some of which involved anti-police themes and some which did not. ECF Nos. 176-3 at 11; 176-2 at 10-19, 22; 177-5 at 22. Most of these protests occurred without police interference or with police interaction that did not result in a citation or arrest. *See* ECF No. 177-5 at 33-39. At one event in October 2012, the marshals at the RJC gave the plaintiffs permission to chalk on the sidewalk so long as they did not chalk the building or the steps. ECF Nos. 177-5 at 33-34; 176-2 at 4; 178-1 at 19-20. The plaintiffs never cleaned up the chalk at their various protests. ECF No. 177-5 at 23.

As chalking activity increased, the City of Las Vegas complained to Metro about graffiti on the sidewalks because it was a monetary loss to the City to have to clean it. ECF Nos. 175-1 at 42; 190-1 at 66; 191-1 at 36-37. Metro officers were told at a briefing that the City was willing to prosecute if Metro observed someone chalking the sidewalks. ECF No. 175-1 at 42. Sergeant Wallace and Lieutenant Liberty were at briefings where this information was conveyed. *Id.*; ECF No. 175-3 at 21.

On June 8, 2013, the plaintiffs were using chalk to write messages that were critical of Metro on the sidewalk in front of Metro's headquarters. As Wallace was pulling out of Metro's parking lot, he saw the plaintiffs on their hands and knees chalking. ECF No. 175-1 at 38-39. Wallace approached the plaintiffs and told them that graffiti on the sidewalk is against the law, and he asked them to stop. *Id.* at 41. The plaintiffs responded that Wallace was wrong and that chalking on the sidewalk was not against the law. ECF No. 176-2 at 23. Wallace told the plaintiffs they could protest so long as they did so lawfully, and he encouraged them to continue their protest using signs instead of chalking the sidewalk. ECF No. 175-1 at 41. When it became

clear the plaintiffs were not going to cease chalking, Wallace decided to issue a citation to each plaintiff. *Id.* at 53-54.

Patterson requested to speak with a supervisor, so Wallace contacted Lieutenant Liberty to respond to the scene. ECF Nos. 175-3 at 25-27; 176-2 at 23. Wallace told Liberty that the plaintiffs were chalking the sidewalk, but he did not tell Liberty about the content of the messages the plaintiffs were writing. ECF No. 175-3 at 33. On the way to the scene, Liberty consulted with a state court judge, a deputy district attorney, and an internal affairs detective to determine whether sidewalk chalking was a crime under Nevada's graffiti statute, Nevada Revised Statutes § 260.330. *Id.* at 29-30. That statute criminalizes "a person who places graffiti on or otherwise defaces the public or private property, real or personal, of another, without the permission of the owner." Each of those individuals opined that writing on a public sidewalk with chalk was a crime under the statute. ECF No. 175-3 at 29-30.

After Liberty arrived, he told the plaintiffs that they would not be cited if they cleaned up the sidewalk. *Id.* at 39. He also told them that they could protest as long as they wanted if they used signs. *Id.* Patterson told Liberty there was case law that chalking was not illegal, but Liberty said he had called a judge and the city manager. ECF No. 176-2 at 24. Liberty also told the plaintiffs that the city manager was tired of protestors using chalk and then leaving it to the City to clean it up. *Id.* The plaintiffs refused to clean up the chalk, so Wallace issued the citations. ECF No. 175-3 at 39.

The graffiti citations that Wallace issued were assigned to Detective Tucker to investigate. ECF No. 175-4 at 12-13. The chalk was still on the sidewalk a couple of days later, and Tucker saw that it listed names of police officers and referred to murders. *Id.* at 13.

A couple of days later, Metro detective Scott Black sent an email to two attorneys for the City of Las Vegas, and copied Wallace and Andrew Burnett, a sergeant with Metro's gang crimes bureau. ECF No. 190-3 at 3-3. In that email, Black indicated that the citations would be the City's responsibility to prosecute because the cases would be misdemeanors. *Id.* Black advised the City attorneys about the content of the writings, including that they said "pigs take your

freedom, take it from them," and that there was an homage to Chris Dorner (who had killed police officers). *Id.* Black also expressed that Metro and the City should decide how to handle sidewalk chalk because it was "becoming increasingly common." *Id.* Black offered his opinion that chalkers be cited and arrested "quite often for defacing city property, including sidewalks," because vandals use many different types of materials and prosecution of all defacement should be consistent. *Id.*

The City attorneys responded that they declined to prosecute the citations. *Id.* at 3. In the City attorneys' opinion, sidewalk chalk did not fall within the statute because it was "easily removed" and therefore did not deface the property. *Id.* They also suggested there was no intent to deface and thus criminal intent was lacking. *Id.* Finally, the City attorneys expressed some concern about First Amendment issues related to "complaint based graffiti enforcement" because that "necessarily centers around the content of any message which the First Amendment of the U.S. Constitution clearly prohibits." *Id.*

Black then contacted the Clark County District Attorney's office for a second opinion. ECF No. 190-4. Black described both the extent of the chalking as well as the messages being conveyed. *Id.* Chief Deputy District Attorney Scott Mitchell responded that in his opinion, chalking was a crime under § 206.330, and if abatement costs were over $250, then it would be a gross misdemeanor. *Id.*

About a month later, on July 13, 2013, Ballentine and Patterson chalked more messages critical of Metro on public sidewalks in front of Metro's headquarters. ECF Nos. 175-4 at 17-18, 20; 176-2 at 27. Metro detective William Matchko (who had been present during the June 8 incident) observed the chalkers but did not have time to stop and address them. ECF Nos. 190-1 at 98-99; 192-1; 191-3. Matchko indicated in an email to Black, Tucker, and Wallace, that if someone prepared an arrest warrant, he would write an affidavit in support. ECF No. 191-3. No officer approached the plaintiffs on that date. ECF No. 176-2 at 28. It cost the City $300 to clean the sidewalk. ECF No. 175-4 at 21; 177-4 at 2, 5, 33 (estimate by City of Las Vegas for $300 to clean 240 square feet of sidewalk). Following this incident, Burnett informed the City that the

1  Clark County District Attorney's Office had a different legal opinion about whether chalking was

2  a crime and that Metro would pursue criminal charges through the Clark County District

3  Attorney. ECF No. 190-3 at 2.  Wallace and Black were copied on this email. *Id.*

4         As part of Tucker's investigation, he monitored the plaintiffs' social media to track their

5  activities, as he does in other graffiti cases. ECF No. 175-4 at 14.  Tucker learned from the

6  plaintiffs' social media that they referred to themselves as the Sunset 3, were part of the Sunset

7  Activist Collective, and were associated with protest groups Nevada CopBlock and Occupy LV.

8  *Id.* at 35.  By tracking their social media, he learned that the group was planning a chalking event

9  at the RJC on July 18. *Id.* at 14.

10        On July 18, Patterson, Ballentine, and Dazo appeared at the RJC for the hearing on the

11  citations, but the citations were not prosecuted. ECF No. 177-5 at 40.  They then chalked

12  messages critical of Metro in front of the RJC. ECF Nos. 175-4 at 24-26; 176-2 at 28-29; 177-5 at

13  40.  Plaintiff Gail Sacco was at the event, but stayed in her car for fear of being arrested or cited.

14  ECF Nos. 176-2 at 28; 179-2 at 9-10.  According to Ballentine and Patterson, there were others,

15  including children, who were also chalking. ECF Nos. 178-3 at 32; 178-4 at 7.

16        Tucker was at the RJC and he asked Ballentine if the chalkers were going to clean up after

17  themselves when they were done. ECF No. 175-4 at 26-27.  Ballentine did not respond. *Id.*

18  Tucker told the protestors that one of the messages written in chalk was inaccurate because the

19  message stated no police officer had ever been put on trial, but Tucker stated one had been. ECF

20  Nos. 176-2 at 29; 177-6 at 2.  According to Patterson, another unidentified officer was trying to

21  get personal information from the protestors. ECF No. 176-2 at 29.  Tucker took pictures of the

22  chalk messages, some of which contained profanity and referred to officer-involved shootings.

23  ECF No. 175-4 at 27.  No one told the plaintiffs they could not chalk on the sidewalk on July 18.

24  ECF No. 177-6 at 2.  The City power washed the chalk off the sidewalk at a cost of $1,250. ECF

25  Nos. 175-4 at 35; 177-4 at 6, 7, 16, 34 (City of Las Vegas estimate of $1,250 to clean 1,000

26  square feet).

27  / / / /

28

Tucker prepared a declaration of arrest relating to the July 13 and July 18 incidents. ECF No. 175-4 at 34. In the declaration of arrest, he referred to the content of the messages, including "fuck pigs" and "fuck the cops." *Id.* at 35. Tucker testified at his deposition that he put that information in the declaration of arrest to give context. *Id.* at 36.

On August 9, 2013, a criminal complaint was filed against Patterson, Ballentine, and Dazo for gross misdemeanors of conspiracy to commit placing graffiti and placing graffiti on or otherwise defacing property. ECF No. 176-5 at 25. They were charged with two counts of each crime based on the July 13 and July 18 incidents. *Id.* The criminal complaint referred to the fact that the alleged graffiti included "derogatory statements and profanity." *Id.* at 26.

The next day, Ballentine and Patterson appeared at another planned protest, where they were arrested. ECF No. 176-2 at 31-32. Patterson spent four days in jail. *Id.* at 44. Ballentine avers that he was denied needed medications while in jail. ECF No. 180-1 at 24-25. Dazo was not arrested, but spent two weeks at a friend's house while the warrant was outstanding. ECF No. 176-3 at 25.

The district attorney later dropped the charges after learning that officers were present at the RJC but did not tell the plaintiffs to stop, and some officers or marshals possibly told the chalkers where they could and could not chalk. ECF No. 178-1 at 11. The district attorney also decided a prosecution was not a good use of limited resources. *Id.* The plaintiffs thereafter filed this civil rights lawsuit against Wallace, Liberty, Tucker, and Metro.

## II. ANALYSIS

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a

genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

### A. First Amendment/Equal Protection Claims[1]

The defendants argue that because the plaintiffs cannot show they were treated differently from similarly situated individuals, they cannot show selective enforcement of the graffiti statute based on their anti-police messages. Additionally, the defendants contend that at least two other people have been arrested for chalking that did not involve anti-police messages. Alternatively, the defendants assert that the individual defendants are entitled to qualified immunity.

The plaintiffs respond that they have three theories that support their claims: (1) selective enforcement; (2) retaliation; and (3) that the graffiti statute is unconstitutional as applied to chalking. The plaintiffs argue there is evidence the statute was selectively enforced because officers usually cite and release chalkers or do not arrest or harass them at all, but Metro officers conducted an extensive investigation into the plaintiffs and then arrested them. The plaintiffs also assert there is evidence the defendants retaliated against the plaintiffs because they disliked the anti-police content of the speech. The plaintiffs contend the statute is unconstitutionally applied to them because the statute is vague. Finally, the plaintiffs argue the individual defendants are not entitled to qualified immunity because the concept that criminal statutes may not be selectively enforced based on viewpoint discrimination or enforced in retaliation for unpopular speech was clearly established.

/ / / /

/ / / /

/ / / /

---

[1] The parties do not separately brief the First Amendment claim under the Nevada Constitution. I therefore likewise do not separately analyze it.

1

        1.  Fourteenth Amendment Equal Protection and First Amendment Selective Enforcement

2
        To prevail on an equal protection selective enforcement claim, the plaintiffs must show

3
"that enforcement had a discriminatory effect and the police were motivated by a discriminatory

4
purpose." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 920 (9th Cir. 2012) (en banc) (quotation

5
omitted). "Enforcement may be shown through a variety of actual or threatened arrests, searches

6
and temporary seizures, citations, and other coercive conduct by the police." *Id.* A discriminatory

7
effect may be shown if "similarly situated individuals . . . were not prosecuted." *Id.* (quotation

8
omitted). Finally, to show discriminatory purpose, the plaintiffs must show the police decided to

9
enforce the law against them based on the exercise of their constitutional rights. *Id.* at 922. A

10
similar claim arises under the First Amendment where "discriminatory enforcement of a speech

11
restriction amount[s] to viewpoint discrimination." *Menotti v. City of Seattle*, 409 F.3d 1113,

12
1146-47 (9th Cir. 2005); *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). That the

13
government may not enforce its laws with a discriminatory purpose was clearly established before

14
the events at issue in this case. *See Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1153 (9th

15
Cir. 2007); *Menotti*, 409 F.3d at 1146-47; *Foti*, 146 F.3d at 635.

16
*a. Wallace and Liberty*

17
        The plaintiffs have not presented evidence raising a genuine issue of material fact that

18
Wallace and Liberty selectively enforced the graffiti statute against the plaintiffs. Wallace and

19
Liberty both testified that June 8, 2013 was the only time either one of them had encountered

20
someone chalking on the sidewalk, either before or after that incident. ECF Nos. 175-1 at 46-47;

21
175-3 at 23, 59. The plaintiffs have not presented any evidence to the contrary. Thus, they

22
cannot show that Wallace or Liberty treated any similarly situated sidewalk chalker differently.

23
        Moreover, there is no evidence Wallace or Liberty enforced the graffiti statute against the

24
plaintiffs based on the content of their speech. Wallace did not initially look at the content of the

25
messages nor did he convey that content to Liberty. Liberty obtained multiple opinions on

26
whether sidewalk chalking was graffiti without reference to the content of those messages. Both

27
officers encouraged the plaintiffs to continue protesting so long as they did not mark on the

28

1    sidewalk.  And both officers gave the plaintiffs the opportunity to avoid a citation if they would

2    clean up after themselves.  No reasonable jury could find Wallace or Liberty violated the

3    plaintiffs' First Amendment and equal protection rights based on selective enforcement of the

4    graffiti statute.  I therefore grant summary judgment in favor of Wallace and Liberty on these

5    claims.

6                                        b.  *Tucker*

7            The plaintiffs have not presented evidence raising a genuine issue of material fact that

8    Tucker selectively enforced the graffiti statute against the plaintiffs.  Tucker testified that the

9    plaintiffs' various incidents were the only ones he was involved with where chalk was used.  ECF

10   No. 175-4 at 39.  The plaintiffs have not presented any evidence to the contrary.  Thus, they

11   cannot show that Tucker treated any similarly situated sidewalk chalker differently.  I therefore

12   grant summary judgment in favor of Tucker on these claims.

13                          2.  First Amendment Retaliation/Chilling

14           The defendants argue that the plaintiffs' case has been based on a selective enforcement

15   theory only, and that the plaintiffs cannot raise a retaliation claim for the first time in their

16   opposition to the defendants' summary judgment motion.  Federal Rule of Civil Procedure 8(a)

17   requires the plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds

18   upon which it rests." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir.

19   2008) (quotation omitted).  The second amended complaint gave fair notice that a First

20   Amendment retaliation theory was at issue.  The plaintiffs alleged the defendants punished them

21   for their content of their speech by harassing, detaining, citing, and arresting them, and that the

22   purpose of the defendants' conduct was to chill the plaintiffs' speech. ECF No. 140.  The fact that

23   the plaintiffs also alleged selective enforcement does not negate a retaliation theory.

24           To establish a First Amendment retaliation claim, the plaintiffs must show that (1) the

25   defendants' conduct "would chill a person of ordinary firmness from future First Amendment

26   activity," and (2) the defendants' "desire to chill [the plaintiffs'] speech was a but-for cause of

27   their allegedly unlawful conduct." *Ford v. City of Yakima*, 706 F.3d 1188, 1193 (9th Cir. 2013).

28

Citing and arresting the plaintiffs would chill a person of ordinary firmness. *Id.* Consequently, the remaining questions are whether the defendants had the desire to chill the plaintiffs' speech and whether, but for that desire, the defendants would not have cited or arrested them.

### a. Wallace and Liberty

As discussed above, there is no evidence Wallace or Liberty enforced the graffiti statute against the plaintiffs to chill their speech. To the contrary, both Wallace and Liberty encouraged the plaintiffs to continue their protests by other means and were focused on the act of placing chalk on the sidewalks without cleaning it up, not on the content of the messages being written. I therefore grant summary judgment in favor of Wallace and Liberty on this claim.

### b. Tucker

The plaintiffs have presented evidence from which a reasonable jury could conclude that, but for the anti-police content of the messages the plaintiffs were writing, Tucker would not have pursued arrest warrants against them. In his case report on the July 13 incident, Tucker included information about the plaintiffs' association with CopBlock, an organization that films citizen interactions with police and posts the videos on the internet. ECF Nos. 192-1 at 2; 175-4-1 at 18. Tucker attended the July 18 event at the RJC but did not tell the plaintiffs to stop chalking. Instead, he took pictures of their activities and challenged the content of their messages by disputing with the protestors the accuracy of their speech (that police officers were not prosecuted for using excessive force against citizens). In the declaration of arrest, Tucker referred to the content of the messages, including "fuck pigs" and "fuck the cops." Finally, Tucker sought arrest warrants instead of citing the plaintiffs. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could conclude that Tucker intended to chill the plaintiffs' anti-police messages by pursuing arrest warrants against them and that he would not have sought the warrants but for the content of the plaintiffs' speech. Tucker is not entitled to qualified immunity because a reasonable officer would know that he cannot use his authority to retaliate against someone based on the content of that person's speech. *See Ford*, 706 F.3d at 1195; *Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006). I therefore deny summary judgment to

1  defendant Tucker on the plaintiffs' First Amendment chilling/retaliation claim and on their

2  related First Amendment right to assemble claim.

3                                     3.  Unconstitutional As Applied

4         The defendants argue the plaintiffs have never pleaded a claim that the graffiti statute was

5  unconstitutional as applied.  I agree.  In their second amended complaint, the plaintiffs alleged

6  that the graffiti statute does not apply to water soluble sidewalk chalk. ECF No. 140 at 13.

7  However, they did not allege that if the statute does criminalize chalking, then it is

8  unconstitutional as applied to them.

9         To the extent the plaintiffs' opposition could be construed as a motion to amend to add

10  that claim, I deny it.  Where a party seeks to amend a pleading after expiration of the scheduling

11  order's deadline for amending the pleadings, the moving party first must satisfy the stringent

12  "good cause" standard under Federal Rule of Civil Procedure 16. *Amerisource Bergen Corp. v.*

13  *Dialysist West, Inc.*, 465 F.3d 946, 952 (9th Cir. 2006); *Johnson v. Mammoth Recreations, Inc.*,

14  975 F.2d 604, 607-08 (9th Cir. 1992).  Rule 16(b)'s "good cause" standard centers on the moving

15  party's diligence. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000); *Johnson*,

16  975 F.2d at 609.  The good cause standard typically will not be met where the party seeking to

17  modify the scheduling order has been aware of the facts and theories supporting amendment since

18  the inception of the action. *See United States v. Dang*, 488 F.3d 1135, 1142-43 (9th Cir. 2007);

19  *Royal Ins. Co. of Am. v. S.W. Marine*, 194 F.3d 1009, 1016-17 (9th Cir. 1999) ("Late amendments

20  to assert new theories are not reviewed favorably when the facts and the theory have been known

21  to the party seeking amendment since the inception of the cause of action.") (quotation omitted).

22         Although Rule 16 does not require a showing of prejudice, I may consider whether

23  prejudice would result to the party opposing amendment. *Coleman*, 232 F.3d at 1295.  Prejudice

24  has been found where the plaintiff moved to amend late in the proceedings, thereby requiring the

25  defendant to go "through the time and expense of continued litigation on a new theory, with the

26  possibility of additional discovery." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161

27  / / / /

28

(9th Cir. 1989) (quotation omitted). Whether to modify the scheduling order's amendment deadline lies within my discretion. *Dang*, 488 F.3d at 1142-43.

The scheduling order's deadline to amend the pleadings expired on September 29, 2015. ECF Nos. 41, 70, 77. The plaintiffs filed their summary judgment opposition on January 31, 2017. ECF Nos. 197/198. The plaintiffs thus have exceeded the deadline by over a year. They have not shown good cause for this delay, particularly because they have known about the facts to support an as-applied challenge from the outset.

Additionally, allowing the plaintiffs to add the claim now would be prejudicial. The plaintiffs have not followed Federal Rule of Civil Procedure 5.1, which requires notification to the Nevada State Attorney General when the constitutionality of a state statute is challenged. I then would have to allow the Attorney General at least 60 days to intervene, unless I were to find the statute is constitutional. Fed. R. Civ. P. 5.1(c). That would add further delay to a case that already has been pending for nearly three years and that has undergone extensive discovery and multiple rounds of dispositive motion briefing. Although the failure to follow Rule 5.1 does not forfeit the plaintiffs' claim, their lack of diligence does. Because good cause does not support amending the scheduling order, I decline to do so.

**B.** *Monell*

The defendants argue that Metro has adequate policies on how to handle protestors and other members of the public, and training on the First Amendment. They also argue there is no evidence a policymaking official ratified unconstitutional acts. They thus contend there is no basis to hold Metro liable.

The plaintiffs respond that Metro lacks adequate policies and training regarding the First Amendment rights of people engaged in controversial speech. The plaintiffs contend Metro's policies are focused on crowd control of large groups of demonstrators, not on avoiding viewpoint discrimination against small groups of protestors. The plaintiffs also argue *Monell* liability may be predicated on the coordinated actions of Metro officers sufficient to amount to a policy or custom.

Metro may be held liable for a constitutional violation only if its officer's conduct was a product of Metro's policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-694 (1978). As a governmental entity, Metro may be liable "only where [Metro] itself causes the constitutional violation through execution of a . . . policy or custom, whether made by its [policy]makers or by those whose edicts or acts may fairly be said to represent official policy." *Menotti*, 409 F.3d at 1147 (quotation omitted). The plaintiffs may show a policy or custom in three ways:

> (1) by showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Id.* (quotations omitted)

The plaintiffs offer two theories of *Monell* liability: (1) that Metro is liable for being deliberately indifferent to its failure to train its officers about the First Amendment rights of small groups of protestors, and (2) that the coordinated activities of various officers in this case demonstrate a custom or practice.

### 1. Training

"A policy can be one of action or inaction." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006). Thus, a plaintiff may establish a *Monell* claim if it shows that "through its omissions [Metro] is responsible for a constitutional violation committed by one of its employees, even though [Metro's] policies were facially constitutional, [Metro] did not direct the employee to take the unconstitutional action, and [Metro] did not have the state of mind required to prove the underlying violation." *Id.* at 1185-86. Under this theory, the plaintiffs must show:

> (1) that a [Metro] employee violated the plaintiff's constitutional rights; (2) that [Metro] has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights.

*Id.* at 1186.

"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Id.* A plaintiff making such a claim must show the training program is inadequate and the inadequate training represents municipal policy. *Id.* However, evidence Metro failed to train one officer is insufficient to establish a deliberate policy. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007). Rather, the inadequate training must be widespread. *Id.* An entity like Metro is deliberately indifferent "when the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [entity] can reasonably be said to have been deliberately indifferent to the need." *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc) (quotation omitted). A plaintiff may show the entity's policymakers were on notice of the need for more or different training by establishing that "the facts available to [the entity's] policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens . . . ." *Id.* (quotation and emphasis omitted).

The plaintiffs have not raised a genuine dispute about the adequacy of Metro's training or that Metro was deliberately indifferent to a deficiency in its training program. Metro trains its employees on the First Amendment and other constitutional rights, as well as how to respond to protests and riots. ECF Nos. 175-1 at 10; 175-3 at 13-15; 175-4 at 8-9; 176-1 at 11. It also trains its employees that people have the right to demonstrate in a legal manner, that police officers should maintain impartiality, and that officers should refrain from expressing opinions. ECF No. 175-5 at 5; 176-1 at 11-12. There is no evidence that Metro was or should have been on notice that additional training specifically on viewpoint discrimination was needed or else constitutional violations were substantially certain to result. Indeed, the plaintiffs themselves testified that they engaged in numerous protests involving both anti-police and other messages during which they were not cited or arrested by the police. That suggests the training given was adequate. The plaintiffs have presented no evidence that prior to the incidents at issue here, Metro received

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

complaints about its officers abusing their power to punish protestors expressing anti-police views. I therefore grant summary judgment on the *Monell* claim to the extent it is based on a theory that inadequate training amounted to deliberate indifference.

### 2. Coordinated Activity

The plaintiffs argue they have presented evidence of a series of coordinated events that suggests a policy or custom. The defendants argue this theory was not adequately pleaded. However, I referenced this theory in my dismissal order. *See* ECF No. 36 at 13-14. I therefore consider it.

The plaintiffs have failed to raise a genuine dispute as to *Monell* liability under this theory as well. The evidence does not raise a genuine dispute that Metro had a custom, policy, or practice of retaliating against or attempting to chill anti-police protestors. The plaintiffs themselves participated in numerous anti-police chalking protests where they were not cited or arrested.[2] Additionally, the defendants have presented evidence that two other individuals were cited for chalking unrelated to anti-police messaging. *See* ECF Nos. 178-6 at 29 (Patterson admitting that he knows Gail Sacco's son, Joseph Sacco, Jr., has been arrested for chalking on public sidewalks under § 206.330 for a Food Not Bombs protest); 179-1 at 2-11 (officer Andrew Keller averring that in August 2013, he was dispatched to a call regarding graffiti using chalk in front of a pawn shop unrelated to anti-police message; chalker was cited under § 206.330); 179-1 at 18 (Gail Sacco admitting she knew her son was arrested on May 23, 2006 for writing chalk on cement outside Huntridge Circle Park).

As discussed above, there is no evidence Wallace or Liberty acted with the intent to chill the plaintiffs' speech. Thus, the fact that Wallace cited the plaintiffs does not aid in showing a custom or policy of retaliating against anti-police protestors. The plaintiffs are left with Tucker's post-citation investigation, Black's emails, Burnett's request that more cameras be installed on Metro headquarters to potentially catch the plaintiffs chalking, and the plaintiffs' subsequent

---

[2] *See also* ECF No. 177-5 at 39 (Ballentine testifying that he had been chalking on the sidewalk in front of Metro for months and no one had told him to stop).

arrest for two chalking incidents. This evidence is insufficient to show a longstanding or widespread policy or custom of retaliating against the plaintiffs on the basis of their speech such that Metro, rather than the individual officers involved, caused the constitutional violation.

The plaintiffs rely on *Blair v. City of Pomona*, 223 F.3d 1074 (9th Cir. 2000). However, that case found sufficient evidence of a custom or practice of retaliating against a whistleblower when numerous fellow police officers and supervisors engaged in a five-month campaign that included:

> insults written on his locker; spittle spat on his locker; the wiring shut of his locker; the theft of his equipment; the cutting off of his radio communication; the trashing of his uniforms; the dumping of drinks in his unit car; the backturning of fellow officers; the tolerated denial of backup; the insults offered by officers to his mother, wife, and children; the blocking of his mother's car; his removal as head of [an anti-nuisance detail] and transfer to a position subordinate to an officer who didn't want him; the telephoning of a threat of bodily injury to him and of death to his family; and the failure to provide a guard for him after the threat.

*Blair*, 223 F.3d at 1076-80.

Here, in contrast, there is no widespread or long-standing policy or custom of discriminating against the plaintiffs (or other anti-police demonstrators) based on the content of their speech. As discussed above, the plaintiffs protested multiple times without incident, and the June 8 citation was not the product of viewpoint discrimination. Even assuming Tucker, Black, and Burnett were motivated by discriminatory animus, the plaintiffs have shown only a two-month investigation by three Metro officers into two incidents of chalking. That is insufficient to ascribe liability to Metro.[3] I therefore grant summary judgment in Metro's favor on the *Monell* claim.

---

[3] The other cases the plaintiffs cite do not alter this conclusion. In *Wallis v. Spencer*, the officers testified there was a longstanding custom of enforcing orders to take protective custody of children without verifying the order actually existed. 202 F.3d 1126,1142-43 (9th Cir. 2000). Additionally, the *Wallis* court held a reasonable jury could find a "standard operating procedure" of obtaining intrusive physical examinations of children without first seeking judicial authorization or notifying the parents based on evidence (1) that the officer obtained the exam even though there was no allegation of sexual abuse and (2) the department had a contract with the hospital to perform these types of exams. *Id.* at 1143 (stating that "given the absence of any individualized suspicion of sexual abuse, it is difficult to imagine . . . why else the Wallis children would have been subjected to the invasive examinations" other than that it was the department's custom and practice to obtain the exams). In *Henry v. County of Shasta*, the plaintiff presented evidence that other similarly situated individuals were treated the same way he was

### C. Negligent Training, Supervision, and Retention

The defendants argue this claim has already been dismissed twice because the defendants are entitled to discretionary immunity under state law. The plaintiffs respond that because the defendants' acts and omissions violate the Constitution, the acts and omissions are not discretionary.

Nevada Revised Statute § 41.032 sets forth exceptions to Nevada's general waiver of sovereign immunity. Pursuant to § 41.032(2), no action may be brought against a state officer or employee or any state agency or political subdivision that is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused."

Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on what type of conduct discretionary immunity protects. *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007) (en banc). The United States Court of Appeals for the Ninth Circuit and other circuits have held that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (citing cases). Because Nevada looks to federal case law to determine the scope of discretionary immunity, and because federal case law consistently holds training and supervision are acts entitled to such immunity, Metro is entitled to discretionary immunity on this claim. Additionally, as discussed above, the plaintiffs have not raised a genuine dispute that any constitutional violation was the

---

around the same time, that he had been treated the same way on a prior occasion, and that numerous jail personnel participated in the violations, both together and independently, at different times throughout the plaintiff's stay in jail. 132 F.3d 512, 518-19 (9th Cir. 1997). Finally, in *Navarro v. Block*, the 911 dispatcher "testified that it was the practice of the Sheriff's Department not to classify domestic violence 911 calls as Code 2 or 'emergency procedure' calls." 72 F.3d 712, 715 (9th Cir. 1995). In contrast, here, the evidence does not show a standard operating procedure. Rather, officers did not act uniformly in response to anti-police chalking protests and officers cited chalkers who were not writing anti-police messages.

result of Metro's training or lack thereof.  Consequently, I grant summary judgment in Metro's favor on this claim.

### D. Intentional Infliction of Emotional Distress

The defendants argue there is no evidence to support the intentional infliction of emotional distress ("IIED") claim because Patterson and Dazo suffered no emotional distress. They also contend Ballentine has suffered mental disorders long before his encounters with Metro police, and thus he cannot show any distress he suffered was a result of those encounters as opposed to his longstanding mental health issues.  Finally, they argue the citations and arrest do not rise to the level of outrageous conduct.

The plaintiffs respond that the evidence shows the defendants targeted them based on the content of their chalked messages, and that constitutes extreme and outrageous conduct.  The plaintiffs also contend that the more extreme the conduct, the less evidence of physical injury or illness the plaintiffs need to show as a result.  They also contend they have presented evidence of emotional distress and Ballentine need not rely on an expert to establish his emotional distress.

Under Nevada law, an intentional infliction of emotional distress claim requires three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (en banc).  "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (quotation omitted).  However, "persons must necessarily be expected and required to be hardened to occasional acts that are definitely inconsiderate and unkind." *Id.* (omission and quotation omitted); *see also* Restatement (Second) of Torts § 46 cmt. d ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.").

The Supreme Court of Nevada has referred to the Restatement (Second) of Torts § 46 as relevant authority for IIED claims under Nevada law. *See, e.g.*, *Olivero v. Lowe*, 995 P.2d 1023,

1027 (Nev. 2000); *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980). A police officer's conduct may rise to the level of extreme and outrageous when he engages in an "extreme abuse" of his position. Restatement (Second) of Torts § 46, cmts. The comments to the Restatement offer examples of when a police officer's conduct may be so outrageous as to support an IIED claim, such as where the officer attempts to extort money by a threat of arrest or attempts to extort a confession by falsely telling the accused her child has been injured in an accident and she cannot go to the hospital until she confesses. "The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability." *Chehade Refai v. Lazaro*, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

To establish severe emotional distress, the plaintiff must demonstrate that "the stress [is] so severe and of such intensity that no reasonable person could be expected to endure it." *Alam v. Reno Hilton Corp.*, 819 F. Supp. 905, 911 (D. Nev. 1993). General physical or emotional discomfort is insufficient to demonstrate severe emotional distress. *Burns v. Mayer*, 175 F. Supp. 2d 1259, 1268 (D. Nev. 2001). "[W]hile medical evidence is one acceptable manner in establishing that severe emotional distress was suffered for purposes of an IIED claim, other objectively verifiable evidence may suffice to establish a claim when the defendant's conduct is more extreme, and thus, requires less evidence of the physical injury suffered." *Franchise Tax Bd. of Cal. v. Hyatt*, 335 P.3d 125, 148 (Nev. 2014), *vacated on other grounds by Franchise Tax Bd. of Cal. v. Hyatt*, 136 S. Ct. 1277 (2016).

Wallace and Liberty did not engage in outrageous conduct by citing the plaintiffs for chalking. As discussed in my prior order, a reasonable officer could believe he had probable cause to cite the plaintiffs. *See* ECF No. 36 at 10.

Tucker also did not engage in extreme and outrageous conduct within the meaning of Nevada's IIED claim. As the Restatement explains, it is "not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional

distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, cmt. d (1965). Rather, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

Like Wallace and Liberty, Tucker reasonably could believe that he had probable cause to arrest the plaintiffs for chalking. Additionally, Tucker had the advice of the District Attorney's Office that chalking constituted a crime. The fact that he acted on that advice, even with a punitive intent, is not so extreme and outrageous as to be utterly intolerable in a civilized community. The plaintiffs' IIED claims thus fail as a matter of law.[4]

### E. Negligent Infliction of Emotional Distress

The defendants argue this claim was twice dismissed and should be summarily adjudicated because the claim is reserved for bystanders and Ballentine is not a bystander. They also argue that even if this is properly construed as a negligence claim, Ballentine cannot show physical impact and any distress caused by the lack of receiving medication while in jail was the responsibility of the medical provider at the jail, not Metro. The plaintiffs did not respond.

The second amended complaint alleges a negligent infliction of emotional distress claim on behalf of Ballentine, but the allegations are more properly characterized as negligence with emotional distress damages. To support a claim of negligence, a plaintiff must show: (1) the defendant acted negligently; (2) either a physical impact or, in the absence of a physical impact, proof of a serious emotional distress causing physical injury or illness; and (3) actual or

---

[4] Moreover, Dazo and Patterson present little to no evidence of emotional distress, much less severe emotional distress. Dazo was not arrested and sought no medical treatment for emotional distress. ECF No. 176-3 at 25. Patterson testified that he was embarrassed about being arrested, was stressed, could not sleep in jail, and was not permitted to shower while in jail. ECF No. 176-2 at 44. Patterson testified that he sought no medical treatment because as soon as he was released, the stress was gone. *Id.* Short-lived stress, sleeplessness, and embarrassment are insufficient to establish severe emotional distress.

Ballentine presented evidence of severe emotional distress but his situation is more complicated given his lengthy history of significant mental health issues pre-dating this incident. Because I conclude Tucker's conduct was not extreme and outrageous as a matter of law, I need not decide whether Ballentine was required to present expert testimony to show causation given his preexisting mental health conditions.

proximate causation. *Barmettler v. Reno Air. Inc.*, 956 P.2d 1382, 1386 (Nev. 1998). An act is a proximate cause of an injury where it appears that "the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." *Van Cleave v. Kietz-Mill Minit Mart*, 633 P.2d 1220, 1221 (Nev. 1981) (quotation omitted). A victim of a defendant's negligence may recover emotional damages if there is an underlying injury separate from the emotional harm. *Kennedy v. Carriage Cemetery Servs., Inc.*, 727 F. Supp. 2d 925, 935 (D. Nev. 2010).

Here, Ballentine asserts that Metro had a duty not to harass, cite, or unlawfully imprison him, that it breached that duty, and as a result Ballentine suffered physical injury because he was denied medication while in jail. Ballentine does not present evidence that his physical injury is causally tied to the alleged breach. The denial of medication while in jail is not the natural and probable consequence of Tucker unlawfully arresting him. I therefore grant summary judgment in the defendants' favor on this claim.

**III. CONCLUSION**

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **(ECF Nos. 174/183) is GRANTED in part and DENIED in part**. The motion is granted as to all claims except the plaintiffs' First Amendment retaliation/chilling and assembly claims against defendant Christopher Tucker.

DATED this 21st day of August, 2017.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE